**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Southern Division**

| | |
|---|---|
| **CAVA GROUP, INC.,** | * |
| **Plaintiff,** | * |
| **v.** | *      **Case No.: GJH-14-355** |
| **MEZEH-ANNAPOLIS, LLC, *et al*.,** | * |
| **Defendants.** | * |

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

**MEMORANDUM OPINION**

In this action, Plaintiff, Cava Group, Inc. ("Cava Group"), alleges that Defendants

Mezeh-Annapolis, LLC, Mezeh-Wheaton, LLC, Saleh Mohamadi, and Steve Walker

(collectively, "Defendants"), unlawfully infringed on Cava Group's trademark and trade dress.

Cava Group and Defendants have each moved for summary judgment. ECF Nos. 45 & 46. Both

motions are fully briefed and no hearing is necessary. *See* Local Rule 105.6 (D. Md.). For the

reasons that follow, Cava Group's Motion for Summary Judgment is denied, and Defendants'

Motion for Summary Judgment is granted, in part, and denied, in part.[1]

**I.     BACKGROUND**

In 2011, Cava Group opened its first fast-casual restaurant—Cava Mezze Grill—in

Bethesda, Maryland, serving Greek- and Mediterranean-inspired food in an assembly-line style,

the service style popularized by Chipotle Mexican Grill. *See* ECF No. 46-2 at 13, 20, 54; *see also*

---

[1] Also currently pending are two Motions in Limine filed by Cava Group. ECF Nos. 41 & 42. Those Motions were
filed before the Court granted the Parties' Joint Motion for Leave to File Dispositive Motions. *See* ECF No. 43.
These Motions will be denied without prejudice to being refiled before trial.

ECF No. 45-4 at 20.[2] Since then, Cava Group has opened several more fast-casual restaurants in various locations throughout Virginia, Maryland, Washington, D.C., and, most recently, in California. ECF No. 46-2 at 55–56; *see also* ECF No. 45-3 at 2. The fast-casual restaurants were inspired by Cava Group's more formal, sit-down restaurant, Cava Mezze, which serves Greek- and Mediterranean-inspired small plates. ECF No. 46-2 at 10. The word "mezze," according to Cava Group, means "small plates." *See id.* at 38.

Cava Group is the owner of United States Registration No. 4,059,522 ("the '522 trademark") for the stylized service mark, CAVA MEZZE GRILL, for restaurant services featuring take-out Mediterranean cuisine, wine, beer and liquor. *See* ECF No. 45-3 at 7. The colors black, white, and orange are claimed as features of the mark.[3] The mark consists of the word "CAVA" in capital letters colored white, except for the letter "V," which is in orange. The phrase "MEZZE GRILL" is positioned under the word "CAVA" and written in smaller font and colored white. All of this wording appears on a black background. The trademark registration indicates that the English translation for the word "cava" is "cave" and the translation for the word "mezze" is "appetizer." *Id.* The registration further indicates that Cava Group makes no claim to the exclusive right to use "mezze grill," apart from the manner in which it is displayed in the mark. *Id.* The '522 trademark as it appears on the registration is shown below:

---

[2] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

[3] When Cava Group was first awarded its mark, the registration claimed the colors black, white, and yellow—not orange—as part of the mark. *See* ECF No. 46-3. According to Brett Schulman, Cava Group's Chief Executive Officer, registration of the color yellow was a mistake made by Cava Group's attorney. ECF No. 46-2 at 52.



ECF No. 45-3 at 7.[4] The United States Patent and Trademark Office ("PTO") issued this registration without requiring proof of secondary meaning.[5] ECF No. 45-3 at 3.

The first several locations of Cava Mezze Grill used similar exterior and interior features. *See* ECF No. 46-2 at 56–58. Specifically, the exterior of the restaurants feature a dark hardwood façade with the stylized logo "Cava Mezze Grill," matching the font style and coloring of the '522 trademark, as shown below:



ECF No. 45-3 at 6. Dark reclaimed wood is used in the interior of the restaurant, along with brushed black metal. ECF No. 46-2 at 56–58, 63, 65. The exterior appearances of more recently

---

[4] Cava Group is also the owner of United States Registration No. 4,059,523 ("the '523 trademark") for the service mark "Cava Mezze Grill," for restaurant services featuring take-out Mediterranean cuisine, wine, beer and liquor. ECF No. 45-3 at 9. The '523 trademark consists of "standard characters without claim to any particular font, style, size, or color," although, as with the '522 mark, no claim was made to the exclusive right to use "mezze grill," apart from that specified in the mark. *Id.*

[5] "Saying that a trademark has acquired secondary meaning is shorthand for saying that a descriptive mark has become sufficiently distinctive to establish a mental association in buyers' minds between the alleged mark and a single source of the product." *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 394 (4th Cir. 2009) (internal quotation marks and citation omitted). The PTO requires evidence of secondary meaning before it will grant registration if the mark is merely descriptive of a characteristic of the product. *Id.* at 395.

opened Cava Mezze Grills differ from the original renditions, however. Specifically, some stores use a white background for the exterior façade with black lettering for the "Cava Mezze Grill" logo, with the same orange "V." *Id.* at 61–63. Others feature the standard white-and-orange font colors, but on a metal bar, rather than a black background. *Id.* at 66. The differences in exterior design choices are attributed in part to differing landlord restrictions on what color and design concepts can be featured on the exterior of a particular building, and in part to the aesthetic design choices of the Cava Group team in conjunction with their architects and design experts. *See id.* at 62–65. Additionally, newer locations feature an open kitchen concept, so that customers can see food being made from scratch. *Id.* at 71.

All of the Cava Mezze Grill restaurants utilize the assembly-line concept, in which patrons of the restaurant can customize their selections to their taste. A customer first chooses a base—a pita, salad bowl, rice bowl, or mini pitas—and then can choose from a variety of spices, proteins, other toppings, and sauces. ECF No. 45-3 at 3. The selection of proteins, which includes lamb sliders, chicken, braised beef, gyro meat, falafel, and grilled meatballs, are served out of cast iron pots. *Id.* These options are reflected on the restaurants' takeout menus that are used at all Cava Mezze Grill locations. *Id.* at 3. The takeout menus are thin rectangular cards that feature a dark background with the white-and-orange "CAVA MEZZE GRILL" logo at the top, akin to the '522 trademark. *Id.* at 3–4, 11–12. The remainder of the text on the menu features the same white and orange colors. *Id.* at 11–12. On one side of the takeout menu appears the phrase, "IT'S WHAT'S ON THE INSIDE THAT COUNTS." *Id.* at 12. Cava Mezze Girl's takeout bags use the same phrase. *Id.* at 4.



ECF No. 45-3 at 11-12.

In addition to its Cava Mezze and Cava Mezze Grill restaurants, Cava Group sells various dips and spreads in various grocery stores on the East Coast. ECF No. 45-3 at 4. The labels on most of those items feature the same colors that appear on the Cava Mezze Grill storefronts, namely, black, white, and orange, and consist of the word "CAVA" in the same standard, block capital letters colored white, except for the letter "V," which is orange. The word "mezze" is positioned under the word "CAVA" in a white font color. One dip, a roasted serrano hummus, is similar, although the words "CAVA" and "mezze" are in a black font, with a white "V" in the word "CAVA," on an orange background. ECF No. 45-3 at 13. *Id.* at 13.

Cava Mezze Grill advertises itself on social media platforms, including Twitter, Instagram, and Foursquare, with the username "Cava Grill." *See* ECF No. 49-2.

Defendant Mezeh-Annapolis, LLC is a Virginia limited liability company, while Defendant Mezeh-Wheaton, LLC, is a Maryland limited liability company. ECF No. 48 at ¶¶ 7–8; ECF No. 54 at ¶¶ 7–8. Defendants Mohamadi and Walker are members of the LLC companies. ECF No. 45-4 at 3. In 2013, Defendants opened a fast-casual Mediterranean restaurant called Mezeh Mediterranean Grill ("Mezeh") in Annapolis, Maryland, and, later that year, opened another location in Wheaton, Maryland. Before then, Mohamadi and Walker had owned franchises of various fast-food restaurants for several years, but decided that they wanted to create their own brand. *See id.* at 6–7. Before coming up with the Mezeh concept, Mohamadi and Walker visited multiple Mediterranean restaurants in and around Washington, D.C., New York, and Chicago, including Cava Mezze Grill. *Id.* at 9. Both Mezeh restaurants use the assembly-line process, in which a customer selects a base, such as a pita, wrap, bowl, rice bowl, or salad bowl, followed by various meats, toppings, and sauces. *Id.* at 13. At first, the Mezeh restaurants used cast iron pots to serve the proteins, but found that they were not practical and could not keep the food hot. Now the proteins are served from stainless steel containers. ECF No. 45-5 at 9.

The word "Mezeh" is a play on words, meant to signify the word "mezzeh," which, according to Mohamadi, who grew up in Afghanistan, means "taste." ECF No. 45-4 at 5, 8. The word "mezze" and Defendants' trade name "Mezeh" are pronounced the same. ECF No. 45-4 at 8; *see also* ECF No. 45-5 at 13. Defendants are the owners of United States Registration No. 4,778,385 for the word "MEZEH," though no colors or other stylization are associated with the mark. ECF No. 46-5.

Defendants have stylized their logo to include the word "mezeh" in a lower-case font with every-other letter colored white, while both "Es" are orange. Underneath the letters "eze" is a smile-shaped curve, also colored orange. *See* ECF No. 45-4 at 12; ECF No. 45-5 at 8. Underneath and to the side of the word "mezeh" is the language "MEDITERRANEAN GRILL" in a smaller font with white lettering. *See* ECF No. 45-6. This is the logo that appears on the façade of both Mezeh locations, which use dark wood or laminate backgrounds on their signage, as shown below.[6] The same dark wood or laminate material that is used on the façade is used in the kitchen, as well. ECF No. 45-4 at 12.



ECF No. 45-6.

Mezeh's logo also appears on the top of the current rendition of Mezeh's takeout menu, which are thin rectangular cards, similar in shape to the Cava Mezze Grill takeout menus, with a black background and white and orange font colors. *See* ECF No. 45-9. Although the original version of Mezeh's takeout menu, which was created by a consultant for Defendants, was a tri-fold menu using multiple colored fonts, including pink, green, orange and blue, *see* ECF No. 45-10 at 26; *see also id.* at 14–15, Mohamadi eventually changed the takeout menu to its current rendition, ECF No. 45-4 at 22, as shown below:

---

[6] According to Walker, dark wood is used on the façade of the Mezeh restaurants. ECF No. 45-5 at 8. In other parts of the record, however, Defendants deny using any wood and instead indicate that façades are made using laminate flooring material. *See* ECF No. 45-12 at 2; ECF No. 45-13 at 2.



ECF No. 45-10 at 26 (original Mezeh takeout menu design); ECF No. 45-9 (current takeout menu design).

According to Mohamadi and Walker, decisions made during the development of the Mezeh logo were made by a design consultant hired by Defendants, General Design Company, whose decisions Mohamadi and Walker deferred to. *See* ECF No. 45-4 at 12, 15. When Defendants started working with General Design Company, the Cava Mezze and Cava Mezze Grill websites were referenced as concepts that Mohamadi and Walker liked. *See* ECF No. 45-4 at 27–28; ECF No. 45-10 at 6. Although General Design Company presented Defendants with

various color options for the logo, such as green, pink, and blue, *see* ECF No. 45-10 at 23, orange was ultimately chosen.[7] The design company brought to Defendants' attention the fact that the Cava Mezze Grill logo uses a color somewhere on the yellow-orange spectrum, and so a darker shade of orange was ultimately settled on for the Mezeh logo.[8] *Id.* at 10.

On at least some social media accounts, Mezeh uses the username "MezehGrill." *See* ECF No. 45-4 at 17. Although Mezeh does not use the phrase "It's What's on the Inside that Counts" in any of their designs, the phrase was once posted to Mezeh's Twitter account. *Id.*; *see also id.* at 33.

This action was initiated on February 5, 2014.[9] ECF No. 1. Defendants filed an Answer to the original Complaint on March 7, 2014, ECF No. 8, but the Complaint was subsequently amended multiple times, ECF Nos. 10, 15, 30 & 48. In the operative Complaint—the Fourth Amended Complaint—Cava Group alleges multiple claims, including service mark infringement (Count I) and trade dress infringement (Count II) in violation of the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a), as well as a common law claim of trademark infringement (Count IV).[10] ECF

---

[7] According to General Design Company, orange was Defendants' preference. ECF No. 45-10 at 11. According to Mohamadi, orange was chosen by the design company. ECF No. 45-4 at 12.

[8] The record also indicates that at some point after opening the Mezeh restaurants, Defendants hired two former Cava Mezze Grill managers. *See* ECF No. 45-4 at 17–18; ECF No. 45-5 at 12. Nowhere in the record is it suggested, however, that these individuals had any involvement with creating or influencing the creation of Mezeh's logo or trade dress.

[9] The action was initiated by Cavamezze Grill, LLC, Cava Group's predecessor-in-interest. *See* ECF No. 1; ECF No. 44 (indicating that, during the course of litigation, Cavamezze Grill, LLC "transferred all rights title and interest of its intellectual property to Cava Group, Inc.").

[10] Cava Group also alleged two additional counts—a Lanham Act claim of unfair competition (Count III), ECF No. 48 at ¶¶ 35–38, and a claim of unfair competition under the Maryland Consumer Protection Act ("MCPA"), Maryland Code, Commercial Law § 13-301(1) (Count V), *id.* at ¶¶ 42–44. Such claims are noticeably absent from Cava Group's memorandum of law in support of its Motion for Summary Judgment. *See* ECF No. 45-1. Perhaps this is so because, with respect to the Lanham Act claim, "there is no specific Federal cause of action for unfair competition. Instead unfair competition under the Lanham Act is a category of claims consisting primarily of causes of action for false designation of origin and false advertising." *Sussman-Automatic Corp. v. Spa World Corp.*, 15 F. Supp. 3d 258, 272 (E.D.N.Y. 2014); *see also Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 706 (4th Cir. 2016) ("[Section] 43(a) [of the Lanham Act] sets forth unfair competition causes of action for false association

No. 48 at ¶¶ 27–41. Following discovery, the Parties filed the presently-pending cross-motions for summary judgment. ECF Nos. 45 & 46.

## II.     STANDARD OF REVIEW

"Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986) (citing Fed. R. Civ. P. 56(c)). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute exists as to material facts. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). If the moving party demonstrates that there is no evidence to support the non-moving party's case, the burden shifts to the non-moving party to identify specific facts showing that there is a genuine issue for trial. When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505 (1986). Importantly, at the summary judgment stage, it is not the Court's function to weigh the evidence but simply to decide if there is a genuine issue for trial. *Id.* at 249.

Cross-motions for summary judgment require that the Court consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). The court must deny

---

and false advertising[.]"). And, with respect to the MCPA claim, that statute only grants a cause of action to *consumers*. *See Putt-Putt, LLC v. 416 Constant Friendship, LLC*, 936 F. Supp. 2d 648, 660 (D. Md. 2013); Md. Code Ann., Com. Law § 13-401. Accordingly, insofar as Cava Group seeks summary judgment on these two claims, its motion is denied. Additionally, although Defendants ask for dismissal of "all" of Cava Group's claims in their Motion for Summary Judgment, the Court will not dismiss Counts III and V at this juncture because no attention is given to these two claims in Defendants' briefing, and Cava Group has therefore not had the opportunity to respond to the bases for dismissal. *See* ECF No. 46-1. Finally, although Cava Group cites Maryland case law respecting a common law claim of unfair competition in its brief, ECF No. 45-1 at 40–41, no such claim is pled in the Fourth Amended Complaint, *see* ECF No. 48, and therefore the Court will not address any such claim now.

both motions if it finds there is a genuine issue of material fact, "[b]ut if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2720 (3d ed.).

## III.   DISCUSSION

### A.  Trademark Infringement

Cava Group's first claim is one of trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1), and its fourth claim is for common law trademark infringement. Common law trademark infringement under Maryland law requires proof of the same elements as § 1114(1), and, accordingly, the Court will consider these two claims together. *See Perini Corp. v. Perini Const., Inc.*, 915 F.2d 121, 125 n.3 (4th Cir. 1990); *see also A.C. Legg Packing Co. v. Olde Plantation Spice Co.*, 61 F. Supp. 2d 426, 432 (D. Md. 1999) ("[Plaintiff's] claim of trademark infringement under federal law also suffices to establish its claim of trademark infringement under the common law of Maryland.").

"To prove trademark infringement, a plaintiff must show both that it has a valid, protectable trademark and that the defendant's use of a 'reproduction, counterfeit, copy, or colorable imitation,' 15 U.S.C. § 1114(1), creates a likelihood of confusion."[11] *Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 91 (4th Cir. 1997) (citing *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 930 (4th Cir. 1995)).

In support of its Motion for Summary Judgment, Cava Group has submitted as evidence its registration certificate for the '522 trademark. ECF No. 45-3 at 7. When the PTO issues a certificate of registration, "that registration provides the registrant with prima facie evidence of

---

[11] Individual defendants, such as Mohamadi and Walker, can be liable for trademark infringement "inasmuch as they have personally participated in the unlawful acts." *World Gym Licensing, Ltd. v. Fitness World, Inc.*, 47 F. Supp. 2d 614, 624 (D. Md. 1999) (citing *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 149 (4th Cir. 1987)).

(1) the validity of the mark and its registration, (2) the registrant's ownership, and (3) the registrant's 'exclusive right' to use the mark on or in connection with the goods and services specified in the certificate of registration." *U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 524 (4th Cir. 2002) (citing *Am. Online, Inc. v. AT & T Corp.*, 243 F.3d 812, 816 (4th Cir. 2001)). Indeed, Defendants do not argue in opposition to Cava Group's Motion for Summary Judgment, or in their own Motion, that Cava Group lacks a valid, protectable trademark. *See* ECF No. 46-1; ECF No. 49. The dispute over Cava Group's claim of trademark infringement hinges, therefore, on whether Mezeh's logo is "likely to confuse an 'ordinary consumer' as to the source or sponsorship of the goods." *Anheuser-Busch, Inc. v. L. & L. Wings, Inc.*, 962 F.2d 316, 318 (4th Cir. 1992) (citations omitted).

To determine if a likelihood of confusion exists, courts in this district generally look to certain factors derived principally from *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984): (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; and (7) actual confusion.[12] "Not all of these factors are of equal importance, nor are they always relevant in any given case." *CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263, 268 (4th Cir. 2006) (internal quotation marks and citation omitted). Rather, the *Pizzeria Uno* factors serve as "only a guide—a catalog of various considerations that may be relevant in determining the ultimate

---

[12] In *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 463–64 (4th Cir. 1996), two additional factors were recognized as relevant to the likelihood-of-confusion analysis—the quality of the defendant's product and the sophistication of the consuming public—but neither Cava Group nor Defendants contend that these two factors tip the scale in either direction in this case. *See* ECF No. 50-1 at 7; ECF No. 46-1.

statutory question of likelihood of confusion."[13] *Anheuser-Busch*, 962 F.2d at 320. "In fact, when the plaintiff's mark is strong and defendant's use of a similar mark has caused actual confusion, the inquiry ends almost as soon as it begins." *Sweetwater Brewing Co., LLC v. Great Am. Restaurants, Inc.*, 266 F. Supp. 2d 457, 462 (E.D. Va. 2003) (citing *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 467 (4th Cir. 1996)); *see also Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 171 (4th Cir. 2006) (noting that "there is no need for each factor to support [plaintiff's] position on the likelihood of confusion issue").

Although many courts have resolved the issue of likelihood of confusion at the summary judgment stage, *see, e.g.*, *Putt-Putt, LLC v. 416 Constant Friendship, LLC*, 936 F. Supp. 2d 648, 660 (D. Md. 2013), *Sweetwater Brewing Co.*, 266 F. Supp. 2d at 465, the United States Court of Appeals for the Fourth Circuit has indicated:

> This pivotal trademark issue is particularly amenable to resolution by a jury for two reasons. First, the jury, which represents a cross-section of consumers, is well-suited to evaluating whether an "ordinary consumer" would likely be confused. Second, the likelihood of consumer confusion is an "inherently factual" issue that depends on the unique facts and circumstances of each case. *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1356 n. 5 (9th Cir. 1985). Likelihood of confusion is "frequently a fairly disputed issue of fact on which reasonable minds may differ," *Warner Bros., Inc. v. American Broadcasting Cos.*, 720 F.2d 231, 246 (2d Cir. 1983), and has long been recognized to be "a matter of varying human reactions to situations incapable of exact appraisement." *Colburn v. Puritan Mills, Inc.*, 108 F.2d 377, 378 (7th Cir. 1939).

---

[13] Seizing on this language from *Anheuser-Busch*, Defendants principally argue in their Motion and in opposition to Cava Group's Motion that the only *Pizzeria Uno* factor that matters in this case is the similarity of the two marks. *See* ECF No. 46-1 at 6; ECF No. 49 at 3–9; ECF No. 52 at 2. Contrary to Defendants' suggestion, in *Anheuser-Busch*, the Fourth Circuit did not conclude that similarity of the two marks was a "threshold" issue entitled to conclusive weight in the likelihood-of-confusion analysis. Rather, the Court only noted that the *Pizzeria Uno* factors are not always relevant in every case—a point particularly salient in that case where the Fourth Circuit was reviewing a trial court's grant of judgment notwithstanding the verdict after a *jury* found that, despite the fact that many of the *Pizzeria Uno* factors tipped in favor of the plaintiff, there was no likelihood of confusion between two marks where the defendant's mark was developed as a parody of the plaintiff's mark. *See Anheuser-Busch*, 962 F.2d at 320–21. In other words, *Anheuser-Busch* stands for the rather unremarkable proposition that a court reviewing a jury's verdict should not rigidly apply the *Pizzeria Uno* factors to override the jury's determination of whether there is a likelihood of confusion. At the summary judgment stage, however, where the court lacks the benefit of the opinion of a jury representing a cross-section of consumers, consideration of all of the relevant *Pizzeria Uno* factors is appropriate.

*Anheuser-Busch*, 962 F.2d at 318. With this in mind, the Court will consider each of the relevant factors as they apply in this case.

The first factor, the strength and distinctiveness of the senior mark, is the "paramount factor" of the *Pizzeria Uno* test. *Pizzeria Uno*, 747 F.2d at 1527. "Varying levels of distinctiveness have been recognized" including, in ascending order of distinctiveness, generic, descriptive, suggestive, or arbitrary and fanciful. *EndoSurg Med., Inc. v. EndoMaster Med., Inc.*, 71 F. Supp. 3d 525, 547 (D. Md. 2014) (citation omitted); *see also Pizzeria Uno*, 747 F.2d at 1527. A generic mark merely employs "the common name of a product or service," *Sara Lee Corp.*, 81 F.3d at 464, and is ineligible for trademark protection, *Ale House Management, Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 140 (4th Cir. 2000). A descriptive mark, by contrast, "describes a particular characteristic of a product in a way that does not require any use of the imagination." *EndoSurg*, 71 F. Supp. 3d at 547–48 (citing *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 394 (4th Cir. 2009)). "A descriptive mark is eligible for protection only if it has established a secondary meaning, in other words, customers understand that the mark refers to a particular business and not simply to what the descriptive word ordinarily describes."[14] *Id.* at 548 (citing *Perini*, 915 F.2d at 124–25). A suggestive mark, one which "stands for an idea which requires some operation of the imagination to connect it with the goods," *Pizzeria Uno*, 747 F.2d at 1528 (internal quotation marks and citation omitted), is eligible for protection, *Ashley Furniture Indus., Inc. v. SanGiacomo N.A. Ltd.*, 187 F.3d 363, 369 (4th Cir. 1999), though the "strength of the mark ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source," *Petro Stopping Centers*, 130 F.3d at 93 (internal quotation marks and citation omitted). With arbitrary and

---

[14] "The factors for determining whether secondary meaning has attached are . . . (1) long use; (2) advertising; (3) sales volume; and (4) identity of service or origin in the minds of the purchasing public." *Pizzeria Uno*, 747 F.2d at 1529 n.3.

fanciful marks—those where common words are applied in unfamiliar ways or words are invented solely for their use as trademarks—"the association between the mark and its source is presumed and the mark is eligible for trademark protection." *Perini*, 915 F.2d 121, 124–25.

When the PTO issues a trademark registration without requiring proof of secondary meaning, courts must give "due respect" to that determination. *Lone Star*, 43 F.3d at 936. In doing so, the PTO has made the determination that the mark is inherently distinctive by being suggestive, arbitrary, or fanciful. *See Am. Online*, 243 F.3d at 816.

Cava Group's mark is conceptually strong insofar as the word "Cava" is arbitrary and not descriptive of a fast-casual restaurant serving Mediterranean food. Moreover, that the PTO issued the relevant trademarks without requiring proof of secondary meaning supports the conclusion that the mark is entitled to protection. Defendants contend, however, that Cava Group's argument with respect to this first *Pizzeria Uno* factor is substantially weakened by the fact that only the word "Cava" is arbitrary, while the other words in the mark, "mezze" and "grill"—the only words with any similarity to the Mezeh mark—were disclaimed by Cava Group in the trademark registration. ECF No. 49 at 5–7; *see also* ECF No. 45-3 at 7 ("No claim is made to the exclusive right to use "Mezze Grill", apart from the mark as shown."). But in evaluating the strength of a trademark, courts generally "look at the mark as a whole, not at its individual components." *EndoSurg*, 71 F. Supp. 3d at 548 (citation omitted); *see also California Cooler, Inc. v. Loretto Winery, Ltd.*, 774 F.2d 1451, 1455 (9th Cir.1985) (quoting *Estate of P.D. Beckwith, Inc. v. Commissioner of Patents*, 252 U.S. 538, 545–46, 40 S. Ct. 414 (1920)) ("'The commercial impression of a trade-mark is derived from it as a whole, not from its elements separated and considered in detail.' Thus, the composite may become a distinguishing mark even though its components individually cannot."); *Specialty Brands, Inc. v. Coffee Bean Distributors,*

*Inc.*, 748 F.2d 669, 672 (Fed. Cir. 1984) ("Although applicant disclaimed the word 'spice' apart

from SPICE VALLEY as a whole, the marks are viewed in their entireties" when considering the

similarity of two competing marks.); *Int'l Bancorp, LLC v. Societe Des Baunes De Mer Et Du*

*Cercle Des Estrangers A Monaco*, 192 F. Supp. 2d 476, 480 n.26 (E.D. Va. 2002) ("'Casino de

Monte Carlo' is a composite mark, and is entitled to protection under [the Lanham Act]

regardless of whether each word in the combination is descriptive."). The Cava Mezze Grill

mark as a whole is distinctive, even if the words "mezze" and "grill" on their own are not.

Accordingly, this factor weighs in favor of finding a likelihood of confusion.

The second factor, similarity of the marks, presents a closer question. This inquiry

involves an examination of the sound, sight, and meaning of the marks at issue. *See George &*

*Co.*, 575 F.3d at 396. Some courts have referred to this test as "really nothing more than a

subjective eyeball test," *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 504

(5th Cir. 1980) (internal quotation marks and citation omitted), wherein a court considers "the

overall impression created by the mark as a whole rather than simply comparing individual

features of the marks," *id.* In evaluating similarity, "the marks need only be sufficiently similar

in appearance, with greater weight given to the dominant or salient portions of the marks." *Lone*

*Star*, 43 F.3d at 936. When a word or words have been disclaimed in the mark, "the word not

disclaimed is generally regarded as the dominant or critical term in determining the

distinctiveness or suggestiveness of the proposed mark." *Pizzeria Uno*, 747 F.2d at 1529–30.

Indeed, the effect of a disclaimer is "to show that the [owner of the mark] is not making claim to

the exclusive appropriation of such matter except in the precise relation and association in which

it appeared in the drawing or description." *Id.* at 1529 (citation omitted). Nevertheless, "courts

employ an 'anti-dissection' rule that requires consideration of the marks as a whole, rather than

the component parts of the marks." *Sweetwater Brewing Co.*, 266 F. Supp. 2d at 462; *see also*

*Pizzeria Uno*, 747 F.2d at 1530 (internal quotation marks and citations omitted) ("[W]hile a

composite term, including disclaimed words or figures, is to be considered in its entirety in

determining validity of a trade mark, it is a settled principle of trade mark law that [t]he

dominant part of a mark may be given extra weight on the issue of likelihood of confusion[.]").

Additionally, as in this case, "[w]here the goods and services are directly competitive, the degree

of similarity required to prove a likelihood of confusion is less than in the case of dissimilar

products." 4 McCarthy on Trademarks and Unfair Competition § 23:20.50 (4th ed.).

Here, the Cava Mezze Grill logo and the Mezeh logo both use bold, block, mostly white

lettering, with certain letters accentuated in some shade of the color orange.[15] The dominant

words of the respective marks, "Cava" and "Mezeh," are featured more prominently, with the

words "Mezze Grill" or "Mediterranean Grill" appearing below the dominant word in smaller,

white font. All of this text appears on a dark background. *See* ECF No. 45-3 at 7; ECF No. 45-9.

Notably, the disclaimed word "mezze" in the Cava mark and the dominant word "Mezeh" in the

Mezeh mark are pronounced the same. ECF No. 45-4 at 8; *see also* ECF No. 45-5 at 13. But

Cava Group has not cited a case, and the Court is not aware of one, where a likelihood of

confusion has been found on the basis of any similarity in sounds between a disclaimed word in

one mark and a dominant word in the allegedly infringing mark.

---

[15] Although Defendants make much of the fact that when the '522 trademark was initially registered, the color yellow, rather than orange, was claimed as a feature of the mark, *see* ECF No. 46-3,they have cited no cases suggesting that a plaintiff's federal registration of one color precludes it from seeking protection of its use of another similar color. *Cf. The Youngstown Sheet & Tube Co.*, 149 U.S.P.Q. (BNA) 656 (P.T.O. Mar. 24, 1966) (concluding that the colors gold and orange are substantially similar and, when used by both parties in a similar form of banding on their products, were likely to cause confusion). Moreover, evidence in the record indicates that the original '522 trademark registration claiming the color yellow as a feature of the mark was a mistake made by an attorney, and that the registration has now been changed to indicate that orange is claimed as a feature. ECF No. 46-2 at 52; ECF No. 45-3 at 7.

And there are also notable differences between the two marks. The word "CAVA" appears in all-capital letters in the Cava Mezze Grill mark, while "mezeh" is in lower-case; the Mezeh mark has two accented letters—the letter "e" both times—while the Cava mark has only one letter accented; the Mezeh shade of orange is slightly darker than that used in the Cava mark; and the Mezeh mark includes an orange smile-shaped curve underneath the letters "eze," whereas the Cava mark includes no such additional accent. ECF No. 45-3 at 7; ECF No. 45-9.

Although the Fourth Circuit has stated that dominant words should be given *greater* weight when considering the similarities of two marks, *see Lone Star*, 43 F.3d at 936, that Court has never suggested that the comparison of such words is entitled to conclusive weight. Thus, the Court, rejects Defendants' argument that the analysis ends at a comparison of the respective dominant words "Cava" and "Mezeh." *See* ECF No. 46-1 at 6–7. Indeed, in a recent case, the United States District Court for the Eastern District of North Carolina considered the similarity of two marks: one for a real estate brokerage firm, Re/Max ("Remax") and one for FavoriteAgent.com—two obviously dissimilar names. *See Re/Max LLC v. M.L. Jones & Associates, Ltd.*, No. 5:12-CV-768-D, 2014 WL 7405461 (E.D.N.C. Dec. 30, 2014). In analyzing the similarity of the two marks, the court explained:

> Both Remax and FavoriteAgent.com use a similar red-over-white-over-blue design, although the bands are of different heights. The Remax bands are equally spaced, whereas defendants' logo has a larger white space with smaller red and blue bands. The Remax signs use a balloon on the left portion of the mark, whereas the defendants' logo uses an outline of a house in the middle of the white portion. Although this factor slightly favors Remax, a reasonable jury might not consider the signs sufficiently similar to result in confusion.

*Id.* at *5. Here, too, although there are indeed certain differences between the Cava Mezze Grill logo and the Mezeh logo, a jury might consider the marks sufficiently similar to cause confusion,

particularly in light of the fact that the businesses are in direct competition, *see* McCarthy, *supra*, § 23:20.50, serving similar food in the same manner.

Defendants do not seem to contest that the third, fourth, and fifth factors—similarity of the goods, facilities, and advertisements, respectively—all weigh in favor of finding a likelihood of confusion. Indeed, in their depositions, Mohamadi and Walker agreed that both Cava Mezze Grill and Mezeh Mediterranean Grill offer similar food in a similar format; both serve Mediterranean-inspired food in a fast-casual, assembly line format, permitting customers to choose from similar food options. *See* ECF No. 45-4 at 20; ECF No. 45-5 at 13. Therefore, "the similarity of the particular goods in question is more than sufficiently close to create a likelihood of confusion." *Sweetwater Brewing Co.*, 266 F. Supp. 2d at 463 (internal quotation marks and citation omitted). Additionally, both restaurants use social media, such as Twitter, as a medium for promotion and advertisement. *See* ECF No. 45-4 at 17; ECF No. 49-2.

A genuine dispute exists with respect to the sixth factor—Defendants' intent. Although a "good faith belief that a subsequently-adopted mark will not lead to confusion . . . is no defense if a court finds actual or likelihood of confusion," *Pizzeria Uno*, 747 F.2d at 1535, proof that a defendant intended to confuse consumers can provide strong evidence of a likelihood of confusion, *id.*; *see also EndoSurg*, 71 F. Supp. 3d at 551 (citing *Osem Food Indus. Ltd. v. Sherwood Foods, Inc.*, 917 F.2d 161, 165 (4th Cir.1990)) ("A second comer to the market is to name its product so [as] to avoid confusing consumers with the first comer's product."). Importantly, however, "knowledge of prior use does not [alone] establish intent." *AMP Inc. v. Foy*, 540 F.2d 1181, 1186 (4th Cir. 1976).

In support of its argument that Defendants intended to copy the Cava Mezze Grill mark, Cava Group points to the following facts: that the Cava websites were referenced as other

concepts that Mohamadi and Walker liked when trying to formulate the design concept for
Mezeh, *see* ECF No. 45-4 at 27–28; ECF No. 45-10 at 6; that the Mezeh takeout menu, although
originally quite different from Cava's, was changed by Mohamadi in a way that closely
resembles the Cava takeout menu, *see* ECF No. 45-10 at 26; *see also id.* at 14–15; ECF No. 45-4
at 22; that Mezeh attempted to serve its protein from cast iron pots, ECF No. 45-5 at 9; and that
the phrase "It's What's on the Inside that Counts" was once posted to Mezeh's Twitter account,
ECF No. 45-4 at 33. Cava Group also suggests that Defendants' choice of the name "Mezeh"
was an attempt to copy the word "mezze," proven by the fact that, according to Cava Group,
there is no evidence that the word means "taste," as Defendants suggest, but only that it means
"small plates." *See* ECF No. 45-1 at 41. Because Mezeh has never served small plates, Cava
Group contends that this choice "heightens the idea that . . . the choice of 'Mezeh' was an effort
to copy Cava Mezze Grill." *Id.*

Defendants, of course, strenuously disagree that they chose the name "Mezeh" in an
effort to copy Cava Group. Rather, Defendants point to the fact that Mohamadi, a native of
Afghanistan, has "used the word all his life to mean 'taste.'" ECF No. 49-7 at 6. Other evidence
in the record also indicates that Mohamadi and Walker never told their design consultants that
they wanted Mezeh to look like Cava Mezze Grill, ECF No. 45-10 at 12, and, specifically, that
the shade of orange used for the Mezeh logo was chosen in an effort to *differentiate* from the
color used in the Cava logo, *id.* at 10. Additionally, during his deposition, Walker pointed out
that cast iron pots are used in many different restaurants. ECF No. 45-5 at 9. And, to contradict
Cava Group's suggestion that the offending "Tweet" was an attempt by Defendants to "blatantly
taunt" Cava Group, *see* ECF No. 45-1 at 29, Defendants have submitted evidence indicating that
the phrase "It's What's on the Inside that Counts" is pervasively used in the restaurant industry.

For instance, a review of federal trademark registrations of the phrase yields seven results, while a search of a similar phrase—"It's what's inside that counts"—yields dozens more filings and registrations. *See* ECF No. 49-8; ECF No. 49-9.

It may be that a jury would conclude that this evidence, *in toto*, shows "too many similarities to be a coincidence," as Cava Group submits, ECF No. 46-2 at 93, or a jury may find that Defendants had no intent to copy any portion of Cava Mezze Grill's concept, and rather that the similarities are fortuitous. Or, at least with respect to the use of cast iron pots and use of the phrase "It's What's on the Inside that Counts," a jury may find the similarities to be nothing more than a reflection of the fact that Cava Mezze Grill is utilizing concepts that are common in the restaurant industry. Based on the evidence submitted, however, the Court cannot conclude at the summary judgment stage that there is no genuine dispute regarding the issue of Defendants' intent.

The final factor to consider is whether there is any evidence of actual confusion. "Evidence of actual confusion is 'often paramount' in the likelihood of confusion analysis." *EndoSurg*, 71 F. Supp. 3d at 551 (quoting *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001)); *see also Lone Star*, 43 F.3d at 937 (noting that the actual confusion factor is "entitled to substantial weight as it provides the most compelling evidence of likelihood of confusion"). "Actual confusion can be demonstrated by both anecdotal and survey evidence." *George & Co.*, 575 F.3d at 398 (citing *Tools USA and Equip. Co. v. Champ Frame Straightening Equip., Inc.*, 87 F.3d 654, 661 (4th Cir. 1996)).

Cava Group relies primarily on an expert report prepared for the present litigation indicating that survey evidence demonstrates the existence of confusion in the marketplace

between the Cava Mezze Grill and Mezeh marks.[16] Hal Poret, a Senior Vice President of ORC International, who has been accepted as an expert in survey research by various tribunals, including United States District Courts, *see* ECF No. 45-11 at 4, developed and administered a survey to 243 respondents to determine the amount of confusion between the Cava Mezze Grill and Mezeh Mediterranean Grill trademarks and trade dress, *see id.* at 8. In the survey, respondents who live or work in close proximity to at least one of Cava's or Mezeh's locations were shown pictures of the storefront and takeout menu of only one restaurant and asked questions aimed at determining whether the respondent associated those pictures with the incorrect restaurant. *See id.* at 6–7. Additionally, a control group of 60 respondents were shown images of an unaffiliated, third party Mediterranean restaurant and asked identical questions to determine the extent to which any confusion exists that is unrelated to trademark similarities. *Id.* at 9. According to Poret's results, taking into account any confusion demonstrated in the control group, there is a 12.3 percent net confusion level between Cava Mezze Grill and Mezeh Mediterranean Grill. *Id.* at 31.

The Fourth Circuit has indicated that it may be "infer[red] from the case law that survey evidence clearly favors the defendant when it demonstrates a level of confusion much below ten percent." *Sara Lee Corp.*, 81 F.3d at 467 n.15. Although the evidence here exceeds that threshold, the Court will not give decisive weight to it at the summary judgment stage in light of the close questions presented by various other factors related to likelihood of confusion.

Thus, upon consideration of the relevant *Pizzeria Uno* factors, the Court concludes that a genuine dispute of material fact exists with respect to whether there is a likelihood of confusion

---

[16] There is also vague anecdotal evidence of actual confusion in the record, *see* ECF No. 46-2 at 97–101, but Plaintiffs do not rely on this in support of their argument respecting the existence of actual confusion.

between the two marks. Accordingly, both Parties' Motions for Summary Judgment are denied with respect to Cava Group's Lanham Act and common law claims of trademark infringement.

## B. Trade Dress Infringement

Cava Group's next claim is for trade dress infringement under the Lanham Act, which prohibits using "any word, term, name, symbol, device, or any combination thereof . . . which . . . is likely to cause confusion . . . ." 15 U.S.C. § 1125(a)(1)(A). Protection against trade dress infringement serves two primary purposes: "(1) to secure to the owner of the mark the goodwill of his business and (2) to protect the ability of consumers to distinguish among competing producers." *Ashley Furniture*, 187 F.3d at 368 (internal quotation marks omitted) (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 774, 112 S. Ct. 2753 (1992)). "A claim of trade dress infringement requires proof of three elements: (1) the trade dress is primarily non-functional; (2) the trade dress is inherently distinctive or has acquired a secondary meaning; and (3) the alleged infringement creates a likelihood of confusion." *Tools USA*, 87 F.3d at 657 (footnote omitted) (citing *Two Pesos*, 505 U.S. at 765 n.1). Defendants' primary argument in opposition to Cava Group's claim of trade dress infringement is with respect to the second element—whether the Cava Mezze Grill trade dress is inherently distinctive or has acquired secondary meaning. Accordingly, the Court will focus its analysis on this element.

"As with generic trade names, the trademark laws do not protect a generic trade dress." *Ale House Mgmt.*, 205 F.3d at 142 (citation omitted). The Fourth Circuit has explained that a trade dress should be considered generic if it is "'well-known' or 'common,' 'a mere refinement of a commonly-adopted and well-known form of ornamentation,' or a 'common basic shape or design,' even if it has 'not before been refined in precisely the same way.'" *Id.* (quoting *Ashley*

*Furniture*, 187 F.3d at 371). A trade dress which is unique or unusual in the particular field at issue, on the other hand, is not generic and may be entitled to protection. *Id.*

In *Ale House*, the Fourth Circuit considered a claim by Ale House Management, Inc. ("AHM") that Raleigh Ale House, Inc. infringed on AHM's trade dress. In describing the AHM facilities, the Court explained:

> The exterior appearances of AHM's facilities are somewhat similar. Each is a rectangular building with a simulated tower, or two, on its roof and a sign on the side designating the facility's name in red block letters. The buildings, however, do not share a common color scheme, size, or shape. The roofs reflect different architectural styles and are constructed of dissimilar materials. Awnings, window sizes, and window shapes vary among the facilities. The exterior materials used to build the facilities vary and include stucco, brick, and siding. The interiors of AHM facilities appear to be more similar, conveying the image of a wood-and-brass decorated pub or pub-style restaurant. The general layout features a central rectangular bar, either as an island or a peninsula, and varying numbers of seats around the bar. Booth seating is located generally on one side of the island or peninsula, and stool seating is located on the other. Numerous television monitors and video games are present, as are pool tables. While the interiors do present a similar general appearance, they are not identical, and virtually all vary in the amount, configuration, and placement of seating, the number of pool tables, and the precise configuration of the bar.

*Id.* at 139. The Raleigh Ale House facility, on the other hand, was a "rectangular building with gray-colored siding and a tower on which 'Raleigh Ale House' [was] painted in red block letters." *Id.* Although Raleigh Ale House had not yet opened at the time of the litigation, the plan for the facility included "a rectangular island bar, with booth seating on one side, stool seating on the other, and tables and chairs at one end. The plans show five television monitors, two pool tables, and a jukebox." *Id.* at 139–40. The Fourth Circuit affirmed a grant of summary judgment in favor of Raleigh Ale House on AHM's trade dress infringement claim, noting that "[o]nce the issue of exterior appearance is set aside, a scant record remains upon which to base a claim for a proprietary interior trade dress or trade dress infringement." *Id.* at 142. Indeed, AHM provided no evidence that a "centrally located rectangular bar with two types of seating on either side and

television monitors, arcades, and pool tables, decorated generally in wood and brass" was "unique or unusual." *Id.* This was particularly apparent, the Court explained, "when AHM's own configurations differ from facility to facility, denying it a single model from which to distinguish the numerous similar configurations used by other food-and-beer establishments." *Id.*

Here, Cava Group claims that the following are elements of the Cava Mezze Grill trade dress: (1) a dark hardwood façade/background with the '522 trademark stylized logo; (2) orange, black, and white color signage; (3) two-color signs made up of white letters with an accentuated orange "V"; (4) orange and white color scheme; (5) a store layout featuring the counter at the back and an open kitchen plan. ECF No. 45-1 at 8. The evidence indicates, however, that not all Cava Mezze Grill locations use the dark hardwood façade with white letters, nor that all locations feature an open kitchen plan. *See* ECF No. 46-2 at 61–63, 71. Moreover, even assuming all Cava Mezze Grill locations consistently utilized an orange and white color scheme, as was the case in *Ale House*, there is no evidence that this décor scheme is "unique or unusual." In fact, there is evidence in the record that the color orange is frequently used in the restaurant business because it is purportedly a food-friendly color. *See* ECF No. 45-10 at 7. Thus, Cava Group cannot satisfy its burden of proof with respect to the second element of its claim of trade dress infringement. Defendants' Motion for Summary Judgment will therefore be granted with respect to Count II, alleging trade dress infringement, and Cava Group's Motion will be denied.[17]

---

[17] Although Defendants request an award of attorneys' fees in their Motion for Summary Judgment, ECF No. 46-1 at 14, resolution of any fee issues will be resolved after trial.

**IV.    CONCLUSION**

For the foregoing reasons, Cava Group's Motion for Summary Judgment, ECF No. 45, is

**DENIED**, and Defendants' Motion for Summary Judgment, ECF No. 46, is **GRANTED**, in part,

and **DENIED**, in part. Specifically, Defendants' Motion is granted with respect to Cava Group's

claim of trade dress infringement, but it is denied in all other respects. A separate Order follows.

Dated:  July 7, 2016                                              /s/

GEORGE J. HAZEL
United States District Judge